276 N.J. Super. 310 (1994)
647 A.2d 1359
ALK ASSOCIATES, INC., A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT,
v.
MULTIMODAL APPLIED SYSTEMS, INC., A NEW JERSEY CORPORATION, CARL VAN DYKE, AN INDIVIDUAL, AND INGRID BRANDLE, AN INDIVIDUAL, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 19, 1994.
Decided October 6, 1994.
*312 Before Judges J.H. COLEMAN,[1] DREIER and VILLANUEVA.
Robert G. Shepherd argued the cause for appellants (Mathews, Woodbridge & Collins, attorneys; Brooks R. Bruneau, on the brief).
Deborah A. Savarese, admitted pro hac vice, argued the cause for respondent (Mason, Briody, Gallagher & Taylor, attorneys; Arthur G. Lash, Ms. Savarese, Stephen L. Humphrey and Charles A. Spitulnik, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Defendants appeal by leave granted from a Chancery Division discovery order requiring that defendants disclose trade secrets to plaintiff under a protective order forbidding plaintiff to use the information. Defendants contend that a disclosure solely to plaintiff's counsel and designated experts, prohibiting dissemination of these secrets to the individual defendants' former employer, is needed to protect defendants in their new endeavor. They explain that even a cursory review of their computer program for the railroad industry by plaintiff's employees would reveal the new approach they are taking and could thus result in tremendous competitive disadvantages to defendants. Plaintiff in sales presentations could counter defendants' advances or could subtly change its own programs in ways which would be difficult to detect but which would detract from the advances made by defendants since they left plaintiff's employ. We here determine that entry of the protective order sought by defendants was both appropriate and well within the power of the chancery judge.
*313 The individual defendants formed the corporate defendant, Multimodal Applied Systems, Inc., in the last month of their service as employees of plaintiff. Defendant Van Dyke, prior to his employment by plaintiff, had been on the staff of the Massachusetts Institute of Technology. There he wrote and published a microcomputer version of a computer program owned by MIT and adopted by the railroad industry to assist the planning of railroad operations. This "Service Planning Model" is now owned by the Association of American Railroads.
After leaving MIT, Van Dyke, in his own consulting company, provided software support to the railroads using the Service Planning Model. He also developed another railroad operations planning system called the "Automated Blocking Model" which also was transferred to the Association of American Railroads. He apparently, however, retained the marketing rights to these products, and at the time he was hired by plaintiff in 1985, he sold his rights to these products to plaintiff. When Van Dyke and defendant Brandle were hired by plaintiff, they executed contracts containing post-employment restrictive covenants barring use of plaintiff's trade secrets. The agreement also transferred to plaintiff any novel ideas conceived by them while in plaintiff's employ.
Since leaving plaintiff in January 1992, the individual defendants have created their own software product for the railroad industry called "MultiRail." Consequently, plaintiff and Multimodal are competing software development companies for the railroad industry. Plaintiff contends, however, that defendants' MultiRail program contains plaintiff's trade secrets and is based on novel ideas conceived by the individual defendants while in plaintiff's employ. Defendants deny this allegation, contending that MultiRail is based upon novel concepts developed by them only after they left plaintiff's service. Plaintiff, through discovery, has demanded disclosure of the contents and background of the MultiRail program, which discovery both sides agree should be subject to a protective order. The narrow issue in this case is whether the protective order may, as requested by defendants, exclude *314 disclosure to plaintiff and its employees and be limited solely to plaintiff's attorneys and experts.
At the hearing on the motion, the trial judge denied defendants' cross-motion for such a restrictive protective order, presumably because the judge believed he did not have the authority to grant that form of protective order. He stated:
I want somebody to tell me how I can order any lawyer not to tell something to his client.... It's suggested here that I enter a protective order by which the lawyer would learn certain information and not be permitted to tell his client.
Now I want somebody to explain who gives me that power, or how do I have that power....
Mr. Shepherd [Defendants' attorney]: Your Honor, I think that power is inherent. I think those types of orders have been entered by other judges that I have been before in New Jersey.
It was then argued to the court that such an order had been entered in Martin v. Educational Testing Serv., Inc., 179 N.J. Super. 317, 431 A.2d 868 (Ch. Div. 1981), and possibly by another judge. The trial judge interrupted and stated that if the parties wanted such an order in this case they would have to get it from the Appellate Division.
I'm not going to enter any such order in any case . .. I've never heard of such a thing.... Quite seriously, I don't understand why or how I have the power to say that a lawyer can hold something back from a client. I just  I won't do it.
Plaintiff claims that the trial judge's decision not to enter the protective order requested by defendants should be sustained since the judge's actions were a reasonable exercise of the judge's discretion. As we have just quoted, however, the judge was under the assumption that he did not have the discretion to enter the requested order. We therefore are not reviewing a true exercise of discretion. We note that some of the judge's statements indicated that even if he had the discretion, he would not shield an attorney's information from the client. But the implication of these statements was that it was beyond the judge's power to enter such an order. While ordinarily we give deference to a discretionary decision, we do not do so where the trial judge acted under a misconception of the applicable law. State v. Steele, 92 N.J. Super. 498, 507, 224 A.2d 132 (App.Div. 1966); Kavanaugh v. *315 Quigley, 63 N.J. Super. 153, 158, 164 A.2d 179 (App.Div. 1960). No deference need be accorded the actions of the trial court where there is a failure to exercise discretion because the court did not realize it has such discretion, or where the exercise of discretion is mistaken or arbitrary.
In Martin an applicant for the Pennsylvania real estate licensing examination brought an action against Educational Testing Service in which he demanded a copy of the examination and answers for the Pennsylvania examination. ETS resisted on the grounds that the requested information was a trade secret and confidential. 179 N.J. Super. at 327, 431 A.2d 868. The Martin court recognized that there are circumstances where the parties may require protection from disclosure and that a protective order should be molded to prevent undue harm to the party who might otherwise be forced to reveal proprietary information. There, the court employed an independent expert to review the examination and answers as well as the answers given by plaintiff to the examination but withheld from plaintiff the test and the answers considered correct by defendant.
Martin relied in part upon Bead Chain Mfg. Co. v. Smith, 1 N.J. 118, 62 A.2d 215 (1948), a case quite similar to the one before us. In Bead Chain, the plaintiff claimed that products manufactured and sold by defendants utilized trade secrets acquired during defendants' tenure with plaintiff. Plaintiff requested an inspection of defendants' machinery, formulae and charts. Id. at 119-120, 62 A.2d 215. Defendants claimed that such inspection of their secrets and confidential working practices would be overly detrimental. The Supreme Court, however, recognized that the discovery rules empower a "trial court to make such orders as will reasonably and appropriately safeguard the rights of defendants," citing the predecessor to R. 4:10-3. The Court stressed that the assembling of evidence for presentation to the Court "must proceed unimpeded and unhampered despite claims of prying, where ... there exists the means of affording adequate protection *316 against unwarranted intrusion and invasion of the rights of one party by another party." Id. at 120-121, 62 A.2d 215.
In Martin v. Educational Testing Service, the court stressed that Bead Chain Mfg. Co. v. Smith did not imply an unlimited right to inspect, but rather was authority for the imposition of boundaries in the application of R. 4:10-3. 179 N.J. Super. at 328, 431 A.2d 868 (citing Eilen v. Tappin's, Inc., 14 N.J. Super. 162, 165-166, 81 A.2d 500 (App.Div. 1951)). The Martin court specifically stated that the trial judge is provided under R. 4:10-3(g) with "discretion to take whatever steps are necessary to protect defendant's confidential documents, while still permitting plaintiff the right of discovery." Id. at 329, 431 A.2d 868.
Applying these principles to the case before us, we see that a court, and especially a court of equity, can enter a protective order for disclosure which may exclude dissemination to a party and its employees. Disclosure may be limited solely to the parties' attorneys and experts who must agree to make no further disclosure, including a disclosure to the clients, without further order of the court. Further orders of protection may be needed if the information is to be utilized at trial. If trade secrets are being disclosed during testimony, the judge may be required to close the courtroom and seal the record of the testimony. The court may also be required to instruct jurors to make no disclosure of what they have heard concerning certain subjects.
Such an order can cut both ways. Either a plaintiff or a defendant may be subject to such an order as circumstances may require. We understand that often in trade secret cases a party may be required to disclose matters that potentially could ruin substantial enterprises if the information were disseminated to even a few individuals. This problem can be demonstrated through an analogy that was argued before us in another matter but which has relevance to the application before us. In a technological trade secret case where a party has discovered information or developed a procedure after sifting through vast quantities of potentially efficacious possibilities, the courts must *317 prevent competitors from even seeing the area from which the successful result was obtained. This principle was likened to the cartoon/game, "Where's Waldo?" In some cases even an indication of the general portion of the puzzle area can greatly reduce the competitor's time to locate the result "independently." In fact, even indicating that the competitor should be looking for "Waldo" might reveal too much information. In the case before us, it ill-behooves a court to permit a former employer, under the guise of a trade secret or restrictive covenant suit, to require former employees to lay bare or even give clues of the result of years of additional research and development.
We remand the matter to the Chancery Division with certain suggestions. While each party no doubt will retain experts, the field is sufficiently esoteric for the court to consider employing an independent expert. We were informed at oral argument that the trial judge also had stated that he did not think he had the power to retain or direct the retention of such an expert. This is not so. N.J.R.E. 614, effective July 1, 1993, provides that "The judge, in accordance with law and subject to the right of a party to make timely objection, may call a witness and may interrogate any witness." This rule may be read as including both the calling of expert and fact witnesses.
We note that the 1963 and 1993 Rules of Evidence did not include an analogue to F.R.E. 706, covering court appointed experts.[2] The common-law of New Jersey, however, has long *318 accepted the appointment of expert witnesses by the court. See State v. Ross, 80 N.J. 239, 248-249, 403 A.2d 457 (1979), and cases there cited; Township of Wayne v. Kosoff, 73 N.J. 8, 14-15, 372 A.2d 289 (1977) (condemnation case); Southern Burlington County NAACP v. Township of Mount Laurel, 67 N.J. 151, 216, 336 A.2d 713, cert. denied, 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975), (Pashman, J., concurring) (experts in zoning and planning); Handleman v. Marwen Stores Corp., 53 N.J. 404, 411, 251 A.2d 122 (1969) (impartial medical expert to aid judge in reviewing workers' compensation proceeding); Finn v. Mayor of the Borough of Norwood, 227 N.J. Super. 69, 74, 545 A.2d 807 (App.Div. 1988) (real estate appraisers); Pascack Ass'n v. Mayor of Township of Washington, 131 N.J. Super. 195, 207, 329 A.2d 89 (Law Div. 1974) (court's consultant on zoning and planning); see also R. 5:3-3, relating to matrimonial cases. Thus the court's power to appoint an independent expert witness cannot reasonably be challenged. As stated in State v. Ross, 80 N.J. at 248, 403 A.2d 457: "It is well settled that a court possesses the inherent power to call witnesses on its own initiative in the quest for the truth. This is the general rule.... This general principle has been followed in New Jersey."
In Wayne v. Kosoff, supra, the Supreme Court explained how a court-appointed expert's report is to be used at trial. We here suggest how the report should be received by the trial court. If an expert witness is to be appointed by the trial judge, and he or she subscribes to the protective order, the expert's tentative report can initially be disseminated to counsel and their experts who in turn can prepare questions and comments for the court-appointed expert. After analyzing such responses, the expert should issue a final report to the court and counsel. In this way, the independent expert's final report can have maximum utility to *319 the court in that it will include answers to any questions or comments that the partisan experts or counsel may have. We commend this procedure to the trial judge in an effort to shorten any court proceedings that may be necessary after the return of the independent expert's report.
We have tried, as we are sure the trial court will now endeavor, to protect defendants' claimed trade secrets from unwarranted disclosure, unless it is determined that defendants' processes improperly contain plaintiff's trade secrets, revealed to defendants while in plaintiff's employ.
The order appealed from is reversed and the matter is remanded to the Chancery Division for further proceedings in accordance with this opinion.
NOTES
[1] Judge Coleman did not originally participate in this case, but has, with the consent of counsel, been added to the panel deciding the matter.
[2] The original proposal of the Committee on the Revision of the Law of Evidence to the Supreme Court of New Jersey dated May 25, 1955 proposed Rules 59, 60 and 61, based upon the original Uniform Rules of Evidence. These rules specifically authorized the appointment of expert witnesses by the court, provided for their compensation and established rules governing credibility. Rules 59 and 61 were actually presented for initial adoption. They were, however, excluded from final adoption. When the 1993 Evidence Rules were proposed, F.R.E. 706 providing for court appointed experts was likewise not included. The 1955 report of the original Committee on the Revision of the Law of Evidence, chaired by Justice Jacobs, the 1963 report of Justice Jacobs which led to the adoption of former Evidence Rules, and the 1991 Supreme Court Committee Comment to the 1994 rules all note, however, that the specific exclusion of the rules concerning court-appointed experts did not negate the power of the court to call such experts, but rather placed such matters within the ambit of practice and procedure.